IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

EQUAL EMPLOYMENT OPPORTUNITY      §
COMMISSION,                       §
                                  §
          Plaintiff,              §
                                  §
v.                                §        CIVIL ACTION NO. H-08-3785
                                  §
AIR LIQUIDE USA LLC and           §
AIR LIQUIDE INDUSTRIAL,           §
U.S., L.P.,                       §
                                  §
          Defendants.             §

## MEMORANDUM OPINION AND ORDER

The Equal Employment Opportunity Commission ("EEOC") brings this action against Air Liquide USA LLC and Air Liquide Industrial, U.S., L.P. (collectively "Air Liquide") on behalf of Jacqueline Ferrel, who was employed by Air Liquide in 2005 and 2006. The EEOC argues that Air Liquide violated Title VII of the Civil Rights Act of 1964 by retaliating against Ferrel after she made allegations of sexual harassment against her manager. Pending before the court are Air Liquide's Motion for Complete Summary Judgment (Docket Entry No. 23) and Air Liquide's Motion to Strike (Docket Entry No. 31) certain statements contained in the EEOC's Response (Docket Entry No. 27). For the reasons explained below, the court will grant in part and deny in part Air Liquide's Motion to Strike, and will deny Air Liquide's Motion for Complete Summary Judgment.

## I.  <u>Factual and Procedural Background</u>

This action concerns an employment dispute between Ferrel and Air Liquide arising from Ferrel's termination from Air Liquide in December of 2006.  The plaintiff, the EEOC, is the agency of the United States government charged with the administration, interpretation, and enforcement of Title VII.  Ferrel is an individual residing in Texas.  Air Liquide USA LLC is a Delaware limited liability company  that does business in Texas.[1]  Air Liquide Industrial, U.S., L.P. is a Delaware limited partnership that does business in Texas.[2]  Air Liquide is in the business of providing gases for industrial applications.

### A.    Ferrel's Employment at Air Liquide

Ferrel began working for Air Liquide Industrial, U.S., L.P. on November 1, 2005, as a Logistics Analyst in the West Zone of Air Liquide's National Scheduling Center in Houston, Texas.[3]  Ferrel's

---

[1]Original Complaint of the United States Equal Employment Opportunity Commission, Docket Entry No. 1, ¶ 4.

[2]<u>Id.</u> ¶ 6.  Air Liquide states in a footnote that because Jackie Ferrel was employed only by Air Liquide Industrial, U.S., L.P., Air Liquide USA LLC is an unnecessary and improper defendant.  <u>See</u> Defendants Air Liquide Industrial U.S. LP and Air Liquide USA LLC's Motion for Complete Summary Judgment, Docket Entry No. 23, p. 1 n.2.  Air Liquide has not moved to dismiss the case against Air Liquide USA LLC, however, and the evidence shows that certain Air Liquide employees involved in Ferrel's termination were employed by  Air Liquide USA LLC.  The court will refer to the defendants collectively as "Air Liquide."

[3]Letter from Dave Wedel to Jacqueline Ferrel, October 26, 2005, Exhibit 1 to Plaintiff EEOC's Response to Defendants' Motion for Complete Summary Judgment ("EEOC's Response"), Docket Entry No. 27.

direct manager was Dan Cahill.[4]  Ferrel's work responsibilities primarily involved the scheduling of carbon dioxide deliveries from Air Liquide's depot in Wilmington, California.

The parties have provided conflicting accounts of Ferrel's job performance in the nine months she worked for Air Liquide before filing a harassment claim against Cahill.  Air Liquide argues that Ferrel's job performance was deficient from her first days of employment.  Air Liquide has provided the deposition testimony of Ahmad Sajadi, the depot manager for the Wilmington depot.  Sajadi characterized Ferrel's performance as "extremely poor,"[5] and described errors in her scheduling and difficulty in reaching her after hours.[6]  Clark Oswald, who took over management of the National Scheduling Center in March of 2006, testified that in or around April of 2006 he learned from Air Liquide's field personnel that Ferrel was experiencing performance problems involving "[p]rimarily scheduling and routing concerns, also concerns from sales personnel that had complaints from customers, depot managers having to modify his schedules to avoid service interruptions of customers."[7]  Air Liquide has also presented a Disciplinary Warning

_____

[4]Id.

[5]Deposition of Ahmad Sajadi, Exhibit E to Defendants Air Liquide Industrial U.S. LP and Air Liquide USA LLC's Motion for Complete Summary Judgment ("Air Liquide's Motion"), Docket Entry No. 23, p. 33:23.

[6]Id. at 33:19 – 38:18.

[7]Deposition of Clark Oswald, Exhibit B to Air Liquide's Motion, Docket Entry No. 23, p. 46:16-19.

Report, labeled a "Verbal Warning," that Cahill presented to Ferrel on February 7, 2006.[8]   The Report states, "Jackie has been reporting to work late without notification and not putting in a full 8 hours (at least).  February 7th reported at 09:15 to 09:30 without prior notification."[9]  This Report appears to be the only documentation of a disciplinary issue with Ferrel that Air Liquide made before August of 2008.

The EEOC asserts that the evidence shows that Ferrel's performance was satisfactory in her first nine months.   An Air Liquide document shows that Ferrel received incentive bonuses of $300 in the first and second quarters of 2006.[10]  These bonuses were greater than those received by three other analysts in her same position and less than those received by three other analysts for those quarters; in other words, she received the median bonus in her zone for both quarters.  The EEOC has also produced an Air Liquide document showing that Ferrel received a $1,000 merit raise on March 26, 2006.[11]  The EEOC suggests that Air Liquide would not have given a merit raise and discretionary bonuses to an employee who was not performing satisfactorily.

---

[8]Disciplinary Warning Report, February 7, 2006, Exhibit A, Part 2 to Air Liquide's Motion, Docket Entry No. 23, p. 2.

[9]Id.

[10]NSC Quarterly Incentives Summary, Exhibit 2 to EEOC's Response, Docket Entry No. 27.

[11]Job Data for Jacqueline Ferrel, Exhibit 3 to EEOC's Response, Docket Entry No. 27.

On May 23, 2006, Ferrel had gastric bypass surgery and as a result began to lose a significant amount of weight.[12]   Ferrel asserts that Cahill's behavior toward her began to change at around this time.   An e-mail she sent to Air Liquide's Human Resources Department in August of 2006 describes a series of unwelcome interactions with Cahill such as an inappropriate phone call after business hours, comments about her physical appearance and personal life, and Cahill's insistence that she sit next to him during training sessions when all other employees were permitted to sit across the desk from him.[13]   Ferrel stated that Cahill's behavior on occasion drove her to tears.[14]   The EEOC has provided affidavit testimony from Amelia Cooper, another Logistics Analyst who was also supervised by Cahill, stating:

> On or about the month of June, 2006 when employees were training with supervisor Dan Cahill, I noticed that Ms. Jackie Ferrel was crying on different occasions after leaving Mr. Cahill's office.  I also witnessed that when Mr. Cahill was training Ms. Ferrel, he would pull a chair around the desk and require Ms. Ferrel to sit next to him while he trained her.  I thought this was strange because no one else was required to sit by him during his training sessions.[15]

---

[12]Deposition of Jacqueline Ferrel, Exhibit 4 to EEOC's Response, Docket Entry No. 27, pp. 113:14 - 114:9.

[13]E-mail from Jacqueline Ferrel to John Andresen, August 10, 2006, Exhibit 8 to EEOC's Response, Docket Entry No. 27.

[14]Id.

[15]Affidavit of Amelia Cooper, Exhibit 6 to EEOC's Response, Docket Entry No. 27.

**B.    Ferrel's Complaint of Sexual Harassment**

In early August Ferrel confronted Cahill about his behavior. Ferrel states, "Right after I had a conversation with Dan about his comments that were making me uncomfortable and they needed to stop, the next morning he produced a writeup."[16]   The parties dispute whether Cahill began drafting the disciplinary writeup before or after Ferrel confronted him about his behavior.   After Ferrel received the write-up she took it to Clark Oswald, the Manager of National Logistics at the National Scheduling Center, to whom Cahill reported.   Ferrel states in her deposition that she gave the write-up to Clark Oswald, and "he told me if I didn't go to HR [Human Resources], then I wouldn't have to worry about it, that that writeup would never go anywhere, he would take care of it."[17]

Ferrel contacted John Andresen in Human Resources on August 8, 2006, stating that she wanted to discuss the problem concerning Cahill and that "she also fears retaliation from Dan [Cahill] if she goes up the chain of command on this issue."[18]   Ferrel sent Andresen an e-mail on August 10, 2006, describing specific instances of Cahill's behavior that made her uncomfortable.[19]

---

[16]Deposition of Jacqueline Ferrel, Exhibit 4 to EEOC's Response, Docket Entry No. 27, p. 91:2-6.

[17]Id. at pp. 107:18 - 108:5.

[18]E-mail by John Andresen, Exhibit 7 to EEOC's Response, Docket Entry No. 27.

[19]E-mail from Jacqueline Ferrel to John Andresen, August 10, 2006, Exhibit 8 to EEOC's Response, Docket Entry No. 27.

Andresen interviewed Ferrel on August 14, 2006.  Ferrel described the unwelcome interactions with Cahill and asked for an "admission and apology from Dan Cahill."[20]  Andresen also interviewed Cahill and four other employees in Ferrel's office location on that day. On August 18, 2006, Andresen sent Ferrel a letter stating:

> Dan admitted to various comments and behaviors that you have perceived as inappropriate. . . . Dan Cahill also received direct counseling from his manager, Mr. Clark Oswald, about his inappropriate comments and behavior to you.  Dan was clearly directed by his supervisor that his inappropriate comments and behavior could be perceived negatively and need to immediately cease. . . . Also, as part of the process of ending this investigation, Dan Cahill will be required to apologize to you for his inappropriate comments and behavior."[21]

Ferrel stated in her deposition that after Andresen's investigation Cahill's inappropriate behavior ceased.[22]

Ferrel sent Andresen an e-mail on August 24, 2006, stating that she was dissatisfied with the apology she received from Cahill, who insisted on providing a verbal apology only.  Ferrel stated that when she insisted on a written apology, Cahill sent her a message stating, "This notice is to confirm the conversation we had this afternoon.  I sincerely request that you accept my

---

[20]Interview Info Sheet by John Andresen, August 14, 2006, Exhibit 5 to EEOC's Response, Docket Entry No. 27.

[21]Letter from John Andresen to Jacqueline Ferrel, Exhibit 9 to EEOC's Response, Docket Entry No. 27.

[22]Deposition of Jacqueline Ferrel, Exhibit A to Air Liquide's Motion, Docket Entry No. 23, p. 202:2-5.

apology."[23]  Ferrel stated in the e-mail, "It just seems to me that the main concern with everyone involved is not to leave a paper trail or openly admit any wrong doing."[24]

## C.   The Events Leading to Ferrel's Termination

On August 28, 2006, Ferrel received a "First Written Warning" concerning "areas of her job performance that require immediate improvement."[25]  The EEOC states that the Warning was an expanded and edited version of the write-up that Cahill gave Ferrel the day after she confronted him about his behavior.[26]  The Warning addresses six issues:

1.   Attendance and Punctuality, listing one date in March and eight dates in August in which Ferrel was tardy to work or departed early;

2.   Schedule Thoroughness, describing two incidents in August in which orders from Ferrel's clients had not been entered properly into the scheduling system;

3.   Schedule Accuracy, listing an event in August in which a driver's schedule was not entered into the system and in which the driver could not reach Ferrel after hours;

4.   Volume of Scheduling Activities, stating that an average analyst schedules over 1,000 deliveries a month but that Ferrel schedules approximately 600 per month;

---

[23]E-mail from Jacqueline Ferrel to John Andresen, August 24, 2006, Exhibit 10 to EEOC's Response, Docket Entry No. 27.

[24]Id.

[25]First Written Warning, August 28, 2006, Exhibit 12 to EEOC's Response, Docket Entry No. 27.

[26]Prior drafts of the First Written Warning are contained in Exhibit 13 to EEOC's Response, Docket Entry No. 27.

5.    After Hours Accessability, citing the same instance
      cited in number 3; and

6.    Completion of Assigned Tasks, stating that Ferrel
      had not completed a scheduling assignment regarding
      documentation of customer usage.[27]

Although the Warning lists the "Date of Current Behavior/Incident"
as August 1, 2006, all but one of the incidents cited in the report
occur in August after that date.[28]

The EEOC argues that the evidence shows that Air Liquide had
decided to terminate Ferrel by early September.  The EEOC has
provided affidavit testimony from Dan Jarreau, a Logistics Analyst
who also worked under Dan Cahill at the time that Ferrel worked at
Air Liquide, who states that shortly after Ferrel brought her claim
of sexual harassment against Cahill, "Mr. Cahill was walking by my
cubicle when he stated that he was going to make sure that
Ms. Ferrel was fired."[29]  The EEOC has provided an e-mail from
Oswald to Andresen and Rick Pedersen, Oswald's supervisor, on
September 3, 2006, discussing a phone recording of an interaction
between Ferrel and a customer.  Clark points out deficiencies in
Ferrel's performance in the call and writes, "we can add this call
to our dismissal 'case'."[30]  The EEOC also presents an e-mail from

---

[27]First Written Warning, August 28, 2006, Exhibit 12 to EEOC's
Response, Docket Entry No. 27.

[28]Id.

[29]Affidavit of Dan Jarreau, Exhibit 21 to EEOC's Response,
Docket Entry No. 27, p. 1.

[30]E-mail from Clark Oswald to John Andresen and Rick Pedersen,
September 3, 2006, Exhibit 14 to EEOC's Response, Docket Entry
No. 27.

Pedersen to Oswald and Andresen on September 6, 2006, stating, "we have plenty of documentation that Ms. Ferrel is not capable of performing the job, and we can not tolerate the liability resulting from further service issues.  Figure out a way to get her out the door."[31]  The EEOC cites these e-mails as evidence that Air Liquide had decided to terminate Ferrel by early September.

On September 6, 2006, Ferrel contacted Andresen and reported that Cahill was changing her schedule without notifying her and that she felt that Cahill was "setting her up for failure."[32]  The EEOC has presented evidence that Cahill contacted at least one customer of Ferrel's to "inquire if we had any complaints or problems with Jackie."[33]  Around September 15, 2006, Cahill moved to a different role in Air Liquide, and his role was taken over by Don McKenna.[34]  This change in roles does not appear to have been related to the conflict between Cahill and Ferrel.

Around October 10, 2006, Air Liquide transferred Ferrel from the West Zone, where she had been supervised by Cahill and McKenna,

---

[31]E-mail from Rick Pedersen to John Andresen and Clark Oswald, September 6, 2006, Exhibit 15 to EEOC's Response, Docket Entry No. 27.

[32]John Andresen's notes, Exhibit 16 to EEOC's Response, Docket Entry No. 27.

[33]Declaration of Ramon Nunez, Exhibit 31 to EEOC's Response, Docket Entry No. 27.  Nunez states that the conversation occurred "sometime in late 2006."

[34]E-mail from Rick Pedersen to Clark Oswald and John Andresen, August 14, 2006, Exhibit 27 to EEOC's Response, Docket Entry No. 27.

to the North Zone, where she was supervised by Rob Spencer.[35]  The parties have offered different explanations for this transfer.  Air Liquide has provided the deposition testimony of Oswald, who states:

> I had agreed with H.R. on their recommendation to give her a fresh start at a different location.  So, I held off on pushing for her termination in the hopes that she would improve her performance scheduling that location, because we already had a significant amount of time invested in training and tenure that she was there.  So, my hopes were that giving her a fresh start would give her a chance to succeed.[36]

The EEOC disputes whether the transfer was intended to benefit Ferrel.  The EEOC has presented the Declaration of Melissa Neilson, a former employee of Air Liquide who reported to Spencer.[37]  Neilson's declaration describes numerous difficulties working with Spencer and states that on one occasion he remarked that "females are not cut out for this type of position."[38]  Neilson stated that she had provided a detailed complaint about her problems with Spencer to Air Liquide's Human Resources Department.[39]  The EEOC argues that Neilson's testimony establishes that Human Resources

---

[35]Affidavit of Donald McKenna, Exhibit 19 to EEOC's Response, Docket Entry No. 27, p. 23:15-22.

[36]Deposition of Clark Oswald, Exhibit B to Air Liquide's Motion, Docket Entry No. 23, p. 102:17-25.

[37]Declaration of Melissa Neilson, Exhibit 20 to EEOC's Response, Docket Entry No. 27.

[38]Id. ¶ 3.

[39]Id. ¶¶ 7-9.

-11-

was aware that Spencer had difficulty managing a female employee, but nevertheless recommended transferring Ferrel under his supervision.

On December 12, 2006, Air Liquide suspended Ferrel and cited four reasons for the decision: (1) Poor attendance and continued tardiness; (2) Scheduling errors; (3) Excessive personal phone calls; and (4) Inappropriate use of the Air Liquide Corporate American Express Card.[40]  On December 18, 2006, Andresen sent Ferrel a letter stating that the investigation into the allegations was complete and that Ferrel would be terminated as of that date.[41]  The letter also stated that Ferrel would receive a settlement amount equal to one month's pay if she signed a Release of Claims form.[42] Ferrel did not sign the release form.

Much of the evidence presented by the parties concerns the sufficiency or insufficiency of the reasons Air Liquide gave for Ferrel's termination.  The court will address that evidence in Part IV below.

**D.   Procedural Background**

The EEOC brought this action against Air Liquide on December 31, 2008, alleging retaliation against Ferrel in violation

---

[40]Letter from John Andresen to Jacqueline Ferrel, December 18, 2006, Exhibit 25 to EEOC's Response, Docket Entry No. 27.

[41]Id.

[42]Id.

of Title VII (Docket Entry No. 1).  Ferrel sought to intervene in the action on February 19, 2009 (Docket Entry No. 9), but withdrew her motion to intervene on March 18, 2009 (Docket Entry No. 12), after Air Liquide moved to compel arbitration of the dispute on the basis of the alternative dispute resolution clause in Ferrel's employment contract (Docket Entry No. 11).  Air Liquide filed a Motion for Summary Judgment on December 23, 2009 (Docket Entry No. 23).  The EEOC filed a Response on January 13, 2010 (Docket Entry No. 27).  Air Liquide filed a Reply on January 27, 2010 (Docket Entry No. 30), and the EEOC filed a Sur-Reply on February 2, 2010 (Docket Entry No. 32).

In addition, Air Liquide has moved to strike certain statements contained in the exhibits to EEOC's Response (Docket Entry No. 31).  The EEOC opposes Air Liquide's Motion to Strike (Docket Entry No. 33).

## II.  <u>Standard of Review</u>

Summary judgment is authorized if the movant establishes that there is no genuine dispute about any material fact and the law entitles it to judgment.  FED. R. CIV. P. 56(c).  Disputes about material facts are "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 106 S.Ct. 2505, 2511 (1986).  The Supreme Court has interpreted the plain language of Rule 56(c) to mandate the entry of summary judgment "after adequate time for

discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 106 S.Ct. 2548, 2552 (1986).  A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  If the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. Id. Factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." Id.

### III.  **Air Liquide's Evidentiary Objections**

Air Liquide has moved to strike several statements offered in affidavits presented by the EEOC in its Response, arguing that the statements in question are not proper evidence for the court to consider in deciding the pending summary judgment motion.[43]  The EEOC argues that the statements in question are proper summary

---

[43]Defendants' Objections to and Motion to Strike Plaintiff's Evidence Filed in Support of Its Response to Defendants' Motion for Complete Summary Judgment, Docket Entry No. 31.

judgment evidence.  Because these motions concern what evidence is proper to consider for the summary judgment motion, the court will address the evidentiary motions first.

## A.    Applicable Law

Federal Rule of Civil Procedure 56(e)(1) provides that "[a] supporting . . . affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."  FED. R. CIV. P. 56(e)(1).  "Conclusory statements in an affidavit do not provide facts that will counter summary judgment evidence, and testimony based on conjecture alone is insufficient to raise an issue to defeat summary judgment."  Lechuga v. Southern Pacific Transp. Co., 949 F.2d 790, 798 (5th Cir. 1992).  Accordingly, the court will not consider any affidavit testimony that does not comply with the standard set out in Rule 56(e)(1).

## B.    Air Liquide's Objections

Air Liquide has objected to statements in the affidavits offered by Melissa Neilson,[44] Don Jarreau,[45] and Amelia Cooper.[46]

---

[44]Declaration of Melissa Neilson, Exhibit 20 to EEOC's Response, Docket Entry No. 27.

[45]Affidavit of Don Jarreau, Exhibit 21 to EEOC's Response, Docket Entry No. 27.

[46]Declaration of Amelia Cooper, Exhibit 22 to EEOC's Response, Docket Entry No. 27.

Melissa Neilson is a former employee who worked as a Logistics Analyst under Rob Spencer and was terminated in 2005. Don Jarreau and Amelia Cooper are current employees of Air Liquide who worked as Logistics Analysts under the supervision of Dan Cahill at the same time as Ferrel.

1.   The Neilson Declaration

The court overrules Air Liquide's first objection, which argues that Neilson's statement that "Rob Spencer spoke to me in an unprofessional and demeaning manner" is impermissible opinion testimony. This statement is an opinion "rationally based on the perception of the witness," which is permitted by Federal Rule of Evidence 701. The court also overrules Air Liquide's second objection. Although the court agrees that Neilson's characterization of Spencer's behavior as "abusive tirades" is a mere conclusory opinion, this one phrase does not detract from the relevance of the rest of the sentence.

The court sustains Air Liquide's third objection, which argues that Neilson's statement, "Orsak wanted me to keep confidential the testimony that Rob Spencer had commented that Spencer did not think that females could do the job," is speculative and not based on any facts showing what Orsak may have wanted. The court agrees that the statement is speculative and inadmissible. The court sustains Air Liquide's fourth objection, which argues that Neilson's statement, "He [Spencer] never made similar calls to my co-workers

before 8AM, even though many did not report until 8," is inadmissible because the affidavit fails to establish that Neilson had personal knowledge of Spencer's actions toward Neilson's co-workers.  The court agrees.

The court overrules Air Liquide's fifth objection to Neilson's statement, "Rob Spencer, however, implied that I was treating him with disrespect by notifying him of my intention to have my eyes checked in the late afternoon of a weekday."  This statement is a rational interpretation of Spencer's comment in an e-mail to Neilson, "Melissa – Show me some respect,"[47] and therefore is not a conclusory opinion based on speculation.  The court sustains Air Liquide's sixth objection, which moves to strike Neilson's statement, "Based on my knowledge and experiences at Air Liquide, I can conclude that if Air Liquide in 2006 transferred a female Logistics Analyst from a Zone not supervised by Rob Spencer into Rob Spencer's Zone, such a transfer was not made for the benefit of the female Analyst, or 'to help her succeed.'"  The court concludes that this statement is not based on personal knowledge because Neilson did not work at Air Liquide in 2006 and because she provides no facts indicating personal knowledge of how Air Liquide makes transfer decisions.

_____

[47]E-mail chain sent by Melissa Neilson, Exhibit 2 to Plaintiff EEOC's Response to Defendants' Objections to and Motion to Strike Plaintiff's Evidence, Docket Entry No. 35.

2.    The Jarreau Affidavit

The court sustains Air Liquide's three objections to statements in the Jarreau affidavit on the grounds that the affidavit fails to provide facts demonstrating personal knowledge of the topics discussed.  The first objection is to Jarreau's statement that "I recognized this tactic as a term used in the workplace called 'bait and snatch.'  This typically occurs when management desires to terminate someone."  The affidavit fails to show that Jarreau has personal knowledge of management decisions, and thus the statement is speculative and not proper summary judgment evidence.  The second objection is to Jarreau's characterization of the North Zone at Air Liquide's National Scheduling Center as a "difficult work environment."  The affidavit fails to show that Jarreau ever worked in this zone or provide any other fact that would show that Jarreau has personal knowledge of the working conditions in that zone.  The statement therefore is speculative and not proper summary judgment testimony.  The third objection is to Jarreau's statement that Ferrel was "placed under a very difficult supervisor named Rob Spencer."  The affidavit does not state that Jarreau ever worked for Spencer, or provide any other fact demonstrating personal knowledge of Spencer's characteristics as a supervisor.  The statement therefore is speculative and not proper summary judgment testimony.

-18-

3.   <u>The Cooper Declaration</u>

The court sustains Air Liquide's two objections to Cooper's Declaration.  The first objection is to Cooper's statement, "By not providing support to Ms. Ferrel in her new Zone, and not giving her specific guidance on the idiosyncracies of the new depots with which she would be working, Air Liquide would be setting her up to fail."  The declaration provides no facts supporting the conclusion that Air Liquide did not provide Ferrel with support or guidance in the new zone.  Also, the declaration provides no basis to conclude that Cooper had personal knowledge of Air Liquide's personnel decisions, and thus the statement that Air Liquide was setting Ferrel up to fail is mere speculation.  This statement is not proper summary judgment evidence.

The second objection is to Cooper's statement, "Based on my knowledge of Ms. Ferrel's satisfactory job performance in the many months I worked with her, if Air Liquide is contending that she performed poorly in the months after being transferred, that would be true only if she had been set up to fail."  The affidavit provides no facts showing that Cooper had personal knowledge of Ferrel's performance after she was transferred, and thus the statement is speculative and not proper summary judgment testimony.

## IV.  **Air Liquide's Motion for Summary Judgment**

Air Liquide argues that it is entitled to summary judgment on Ferrel's retaliation claim because the EEOC cannot establish the

-19-

element of causation required to bring a _prima facie_ case of retaliation under Title VII, and alternatively that if the EEOC can establish a _prima facie_ claim then Air Liquide is entitled to summary judgment because it has articulated a valid nondiscriminatory reason for terminating Ferrel.   The EEOC responds that summary judgment is improper because it has raised a valid _prima facie_ claim of retaliation and because there are material questions of fact regarding whether the reasons advanced by Air Liquide for Ferrel's termination are in fact pretext for retaliation.

**A.   Applicable Law**

Under Title VII, a plaintiff can prove a claim of retaliation by either direct or circumstantial evidence.   See _Septimus v. Univ. of Houston_, 399 F.3d 601, 608 (5th Cir. 2005); _see generally Russell v. McKinney Hosp. Venture_, 235 F.3d 219, 222 (5th Cir. 2000).   Direct evidence of discrimination may be sufficient in itself to defeat summary judgment.   See _Vance v. Union Planters Corp._, 209 F.3d 438, 442 (5th Cir. 2000).   Cases built on circumstantial evidence are analyzed under the _McDonnell Douglas_ burden-shifting framework.   _McDonnell Douglas Corp. v. Green_, 93 S.Ct. 1817, 1824 (1973).   Under this framework, a Title VII plaintiff must first establish a _prima facie_ case of retaliation by a preponderance of the evidence.   _Id._; _Gee v. Principi_, 289 F.3d 342, 345 (5th Cir. 2002).   To prove a _prima facie_ case of retaliation, the plaintiff must establish that (1) she participated

-20-

in activity protected by Title VII; (2) her employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse employment action.  See Septimus, 399 F.3d at 609 (and cases cited therein).

Once a prima facie case has been established, there is a presumption of discrimination, and the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the challenged employment action. McDonnell Douglas, 93 S.Ct. at 1824-25; Gee, 289 F.3d at 345. The employer's burden is one of production, not persuasion, and involves no credibility determinations. Texas Dep't of Community Affairs v. Burdine, 101 S.Ct. 1089, 1094-95 (1981). If such a showing is made, the burden shifts back to the plaintiff to "prove that the employer's stated reason for the adverse action was merely a pretext for the real, discriminatory purpose." Gee, 289 F.3d at 345.

A plaintiff may establish pretext "by showing that the employer's proffered explanation is false or 'unworthy of credence.'" Laxton v. Gap Inc., 333 F.3d 572, 578 (5th Cir. 2003) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 120 S.Ct. 2097, 2106 (2000)). A "plaintiff can survive summary judgment by producing evidence that creates a jury issue as to the employer's discriminatory animus or the falsity of the employer's legitimate nondiscriminatory explanation." Sandstad v. CB Richard Ellis, Inc., 309 F.3d 893, 897 (5th Cir. 2002). "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the

employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated," and may therefore be enough to prevent summary judgment or judgment as a matter of law.  Reeves, 120 S.Ct. 2109.

**B.    No Direct Evidence of Retaliation**

The EEOC argues that summary judgment is inappropriate because it has presented direct evidence that Ferrel's termination was retaliatory.  The Fifth Circuit has held that summary judgment is not proper where a plaintiff has presented direct evidence of discrimination.  See Vance, 209 F.3d at 442 (5th Cir. 2000) (holding that a defendant's remarks constitute sufficient evidence of discrimination if the remarks are (1) related to sex; (2) proximate in time to the employment action; (3) made by an individual with authority over the employment decision; and (4) related to the employment decision at issue).

The EEOC cites three pieces of testamentary evidence that it argues constitute direct evidence of retaliation.  It cites the statement by Jarreau that Cahill "stated that he was going to make sure that Ms. Ferrel was fired."[48]  It cites Oswald's reference to a "dismissal case" in an e-mail on September 3, 2006.[49]  Third, it

---

[48]Affidavit of Dan Jarreau, Exhibit 21 to EEOC's Response, Docket Entry No. 27, p. 1.

[49]E-mail from Clark Oswald to John Andresen and Rick Pedersen, September 3, 2006, Exhibit 14 to EEOC's Response, Docket Entry No. 27.

cites the e-mail by Pedersen on September 6, 2006, which states, "Figure out a way to get her out the door."[50]   The EEOC argues that this evidence alone is sufficient to preclude summary judgment. The court disagrees.

The evidence cited by the EEOC is not direct evidence of retaliation.   While the statements might show that management employees at Air Liquide had determined by early September that Ferrel should be terminated, the statements do not on their face establish a retaliatory motivation.   None of the statements articulate a desire to terminate Ferrel because she made a harassment claim against Cahill; the statements are equally consistent with a desire to terminate Ferrel because of poor work performance.   An inference of retaliation could only be drawn from the circumstances under which the statements were made, which means that this evidence is properly considered under the McDonnell Douglas burden-shifting framework.   See McDonnell Douglas, 93 S.Ct. at 1824.

C.   **EEOC's Prima Facie Claim**

Under the McDonnell Douglas framework, a Title VII plaintiff must first establish a prima facie case of retaliation by a preponderance of the evidence.   See Gee, 289 F.3d at 345.   To prove a prima facie case of retaliation, the plaintiff must establish

---

[50]E-mail from Rick Pedersen to John Andresen and Clark Oswald, September 6, 2006, Exhibit 15 to EEOC's Response, Docket Entry No. 27.

that (1) she participated in activity protected by Title VII;
(2) her employer took an adverse employment action against her; and
(3) a causal connection exists between the protected activity and
the adverse employment action.  See Septimus, 399 F.3d at 609.

Air Liquide does not dispute that Ferrel engaged in protected
activity under Title VII when she brought a claim of sexual
harassment against her manager, or that she ultimately suffered an
adverse employment action when her employment was terminated.[51]  The
first two elements of a prima facie claim are therefore not in
issue.  Air Liquide argues, however, that the EEOC cannot establish
any causal connection between Ferrel's complaint of harassment and
her termination.

1.  Causal Connection - Applicable Law

The burden of establishing the "causal link" element of a
prima facie case is much less onerous than the standard for proving
"but-for" causation required for the determination of the ultimate
issue of retaliation.  See Ackel v. Nat'l Communications, Inc., 339
F.3d 376, 385 (5th Cir. 2003).  "[A] plaintiff need not prove that
her protected activity was the sole factor motivating the
employer's challenged decision in order to establish the 'causal
link' element of a prima facie case."  Long v. Eastfield College,
88 F.3d 300, 305 n.4 (5th Cir. 1996).  However, a plaintiff must
produce some evidence of a causal link between the protected

_____

[51]Air Liquide's Motion, Docket Entry No. 23, p. 3.

-24-

activity and the adverse employment action.  Ackel, 339 F.3d at 385.

In evaluating the "causal link" element of a retaliation claim, the court focuses on three factors:  "(1) the extent of the employee's disciplinary record; (2) whether the employer followed its policies and procedures in dismissing the employee; and (3) the temporal relationship between the protected action and the termination."  Nowlin v. Resolution Trust Corp., 33 F.3d 498, 507 (5th Cir. 1994); see also Medina v. Ramsey Steel Co., 238 F.3d 674, 684 (5th Cir. 2001) ("A 'causal link' is established when the evidence demonstrates that the employer's decision to terminate was based in part on knowledge of the employee's protected activity . . . [such as where] the plaintiff shows that the employment decision and [her] protected activity were not wholly unrelated." (internal citations omitted)).  "[T]emporal proximity alone, when very close, can in some instances establish a prima facie case of retaliation."  Strong v. University Healthcare System, L.L.C., 482 F.3d 802, 808 (5th Cir. 2007) (citing Clark Co. Sch. Dist. v. Breeden, 121 S.Ct. 1508, 1511 (2001)).

2.  Evidence for a Causal Connection

The EEOC argues that the temporal proximity between Ferrel's complaint of harassment and the decision by Air Liquide management to terminate Ferrel is sufficient to provide a causal link between the two.  Ferrel first confronted Cahill in early August of 2006,

and she met with Oswald on the following day.  She first reported
her harassment claim to Andresen on August 8, 2006.  The EEOC does
not dispute that Ferrel was not terminated until December 18, 2006,
which was more than four months after Ferrel's Title VII protected
activity.   The EEOC argues, however, that the real decision was
made in the few weeks immediately following her harassment claim.
It cites the statement by Jarreau that Cahill, shortly after Ferrel
made her claim, "stated that he was going to make sure that
Ms. Ferrel was fired."[52]   It cites Oswald's reference to a
"dismissal case" in an e-mail on September 3, 2006.[53]  And it cites
Pedersen's statement in an e-mail on September 6, 2006, that
Andresen and Oswald should "Figure out a way to get her out the
door."[54]

     A rational juror could look at these facts and conclude that
the decision to terminate Ferrel had effectively been made by early
September of 2006, less than a month after she made her initial
harassment claim.  A juror could conclude, based on this temporal
proximity, that "the employer's decision to terminate was based in
part on knowledge of the employee's protected activity."   See

---

     [52]Affidavit of Dan Jarreau, Exhibit 21 to EEOC's Response,
Docket Entry No. 27, p. 1.

     [53]E-mail from Clark Oswald to John Andresen and Rick Pedersen,
September 3, 2006, Exhibit 14 to EEOC's Response, Docket Entry
No. 27.

     [54]E-mail from Rick Pedersen to John Andresen and Clark Oswald,
September 6, 2006, Exhibit 15 to EEOC's Response, Docket Entry
No. 27.

<u>Medina</u>, 238 F.3d at 684.   One could infer from the timing of Oswald's and Pedersen's e-mails that they made their decisions to pursue Ferrel's dismissal in part because she had become a trouble-maker, the sort of problem employee who files claims against her manager and then demands a written apology.

There are other factors in the record from which a juror could conclude that retaliation played at least a partial causal role in Air Liquide's decision to terminate Ferrel.   The Fifth Circuit states that courts should consider "the extent of the employee's disciplinary record" in determining the causal link.   <u>Nowlin</u>, 33 F.3d at 507.   Air Liquide has provided a substantial record of the disciplinary issues -- poor performance, tardiness, excessive cell-phone use, and abuse of the corporate credit card -- that it asserts were the reasons for Ferrel's termination.   It is notable, however, that the documentation in Ferrel's disciplinary record arises almost exclusively after she made her harassment claim.   If it is true, as Air Liquide asserts, that "Ferrel's performance problems began almost immediately after she began working for Air Liquide,"[55] then it is at least curious that Air Liquide only began to document those issues immediately after Ferrel made her harassment claim.   Ferrel testified that Cahill gave her the first draft of her First Written Warning the day after she confronted him

---

[55]Air Liquide's Motion, Docket Entry No. 23, p. 5.

about his behavior.[56]  Of the examples of performance problems cited in the First Written Warning, only one of them occurred before Ferrel confronted Cahill.[57]  There is also evidence that Cahill may have actively solicited complaints from customers about Ferrel in late 2006.[58]

Fact questions exist about the compilation of the disciplinary record and the role that the record played in Ferrel's termination. The parties have presented conflicting evidence whether Ferrel's performance was satisfactory prior to her harassment claim.  If, as Air Liquide asserts, her performance was deficient prior to her making the claim, there is a fact question about why Air Liquide began actively documenting performance lapses immediately after Ferrel made her claim when there is essentially no documentation of such issues prior to her claim.  Finally, there are fact questions about whether the reasons that Air Liquide asserts for Ferrel's termination in the disciplinary record are in fact the true reasons for Ferrel's termination; these questions will be addressed further below in the discussion of pretext.

Finally, in addition to the issues of the timing of Air Liquide's decision and documentation, the record shows that Air

---

[56]Deposition of Jacqueline Ferrel, Exhibit 4 to EEOC's Response, Docket Entry No. 27, p. 91:2-6.

[57]First Written Warning, August 28, 2006, Exhibit 12 to EEOC's Response, Docket Entry No. 27.

[58]Declaration of Ramon Nunez, Exhibit 31 to EEOC's Response, Docket Entry No. 27.

Liquide made changes to Ferrel's work situation in the immediate aftermath of her harassment claim.  Ferrel reported to Andresen on September 6, 2006, that Cahill was changing her schedule without notifying her and that she felt that Cahill was "setting her up for failure."[59]  In October, after Cahill had left the West Zone and been replaced by McKenna, Air Liquide transferred Ferrel to the North Zone, where she was supervised by Spencer.[60]  While Air Liquide asserts that this was done to provide Ferrel with a fresh start, the EEOC argues that transferring Ferrel to a manager who had previously had a problematic relationship with a female employee was intended to set Ferrel up for failure.  Viewing this evidence, a rational juror could conclude that Ferrel already had a fresh start when McKenna replaced Cahill, and might question whether it was really in Ferrel's best interests to move her from a zone where the customers and depot contacts were known to her to a zone where the customers and depot contacts were unfamiliar.  For present purposes, the fact that changes were made to Ferrel's work situation shortly after she made her harassment claim, and the fact that there is conflicting evidence on whether these changes were made to help or hinder Ferrel, show that there are fact questions regarding whether retaliation was involved in any of the changes to Ferrel's work situation.

---

[59]John Andresen's notes, Exhibit 16 to EEOC's Response, Docket Entry No. 27.

[60]Affidavit of Rob McKenna, Exhibit 19 to EEOC's Response, Docket Entry No. 27, p. 23:15-22.

3.    <u>Conclusion</u>

The EEOC has presented evidence from which a rational juror could conclude that Air Liquide's decision to terminate Ferrel was based in part on knowledge of her protected activity.  The EEOC has therefore established the causal connection required to raise a <u>prima facie</u> case of retaliation under Title VII.

**D.    A Legitimate, Nondiscriminatory Reason for Termination**

Once a plaintiff has established a <u>prima facie</u> case of retaliation, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the challenged employment action.  <u>McDonnell Douglas</u>, 93 S.Ct. at 1824-25.  The employer's burden is one of production, not persuasion, and involves no credibility determinations.  <u>Burdine</u>, 101 S.Ct. at 1094-95.

When Air Liquide suspended Ferrel on December 12, 2006, it informed her that it was doing so for four reasons:  (1) Poor attendance and continued tardiness; (2) Scheduling errors; (3) Excessive personal phone calls; and (4) Inappropriate use of the Air Liquide Corporate American Express Card.[61]  Air Liquide argues that each of these reasons provides a legitimate, nondiscriminatory reason for Ferrel's termination.

1.    <u>Poor Attendance and Continued Tardiness</u>

Air Liquide has presented testimony that Ferrel often reported for work after the time she had been instructed to arrive.  Cahill

---

[61]Letter from John Andresen to Jacqueline Ferrel, December 18, 2006, Exhibit 25 to EEOC's Response, Docket Entry No. 27.

testified that tardiness issues arose in "the first few weeks of
her employment."[62]  Tardiness was the performance issue identified
in the "Verbal Warning" Ferrel received on February 7, 2006.[63]
Spencer testified that after she had been transferred to work under
his supervision, "She was told what time she should be at work, and
she was consistently late for at least one week."[64]

Air Liquide has presented evidence that tardiness was a reason
for Ferrel's termination.  Because tardiness is a legitimate, non-
discriminatory reason for an employer to terminate an employee, Air
Liquide has met its burden regarding this factor.

Air Liquide has failed, however, to produce evidence that
Ferrel's attendance was a cause of her termination.  The EEOC notes
that Air Liquide has made no contention that Ferrel exceeded the
vacation days to which she was entitled in 2006.  Regarding
vacation days listed on the initial write-up that Cahill gave
Ferrel in early August of 2006, Oswald stated in his deposition, "I
was not concerned, per se, about the vacation days that were noted
on the report because those were vacation days to which she was, in
essence, entitled to."[65]  The court concludes that Air Liquide has

----

[62]Deposition of Dan Cahill, Exhibit H to Air Liquide's Motion,
Docket Entry No. 23, p. 56:15-18.

[63]Disciplinary Warning Report, February 7, 2006, Exhibit A,
Part 2 to Air Liquide's Motion, Docket Entry No. 23, p. 2.

[64]Deposition of Rob Spencer, Exhibit C to Air Liquide's Motion,
Docket Entry No. 23, p. 84:7-8.

[65]Deposition of Clark Oswald, Exhibit 18 to EEOC's Response,
Docket Entry No. 27, p. 82:9-11.

failed to produce evidence that Ferrel's attendance was a reason for her termination.  Therefore, in the discussion of pretext below the court will consider Air Liquide's arguments concerning tardiness but not attendance.

## 2.  Scheduling Errors

Air Liquide has presented deposition testimony from Scott Fleming, the manager of the Illinois depot, that Ferrel was responsible for scheduling after she was transferred to the North Zone and that Ferrel's performance in scheduling deliveries was "consistently poor."[66]  Fleming testified that Ferrel's performance deficiencies included missed deliveries, allowing customer levels to fall too low, mis-scheduled drivers, and poor customer service.[67] Air Liquide has also provided several e-mails dating from late-October to early-December, which Fleming identified as relating to specific scheduling errors and customer problems caused by Ferrel's poor performance.[68]  Fleming testified that he reported the problems to Spencer and Oswald when he concluded that the performance issues "weren't going to improve."[69]

---

[66]Deposition of Scott Fleming, Exhibit D to Air Liquide's Motion, Docket Entry No. 23, p. 30:20.

[67]Id. at 30:11 - 31:24, 44:19 - 45:20, 51:24 - 55:12, 74:13 - 75:9.

[68]Id., Fleming Deposition Exhibits 2, 4, 5, 6, 8, 11, 12, 13, 14, 15, 17.

[69]Id. at 33:12-16.

The court concludes that Air Liquide has produced evidence that it terminated Ferrel because of documented scheduling errors. Because deficiency in work performance is a legitimate, nondiscriminatory reason for terminating an employee, Air Liquide has met its burden regarding this explanation for Ferrel's termination.

### 3.  Excessive Personal Phone Calls

Air Liquide argues that Ferrel's excessive personal phone calls during working hours provided a further legitimate, nondiscriminatory reason for Ferrel's termination.  Air Liquide provides Oswald's testimony that someone told him that Ferrel was making excessive personal calls.[70]  Oswald also states that the charge of excessive personal calls was based on a cell phone bill that arrived at the Air Liquide office.[71]  The bill was addressed to "Wallace Theodore Hulse" and lists calls dating from October 4, 2006, to November 3, 2006.[72]  Ferrel acknowledged that this bill was for her personal cell phone.[73]  Air Liquide presents the testimony of Andresen that an Air Liquide employee named Mona Park counted up the phone calls and attempted to determine which calls were

---

[70]Id. at p. 55:4-17.

[71]Id.

[72]Sprint Bill for Wallace Theodore Hulse, Exhibit A, Part 2 to Air Liquide's Motion, Docket Entry No. 23, pp. 10-30.

[73]Deposition of Jacqueline Ferrel, Exhibit A to Air Liquide's Motion, Docket Entry No. 23, pp. 168:17 – 170:8.

personal.  Andresen states, "If I remember right, the number was around 1,400 personal calls in a month, many of those during work hours."[74]

Air Liquide has presented evidence that Oswald had reason to believe that Ferrel was making excessive personal phone calls during work hours.  Because this is a nondiscriminatory reason for Ferrel's termination, Air Liquide has met its burden regarding this explanation.

### 4.   Inappropriate Use of the Corporate Credit Card

Air Liquide argues that Ferrel's misuse of the corporate American Express card constituted a legitimate, nondiscriminatory reason for Ferrel's termination.  Air Liquide presents evidence that it received a bill dated November 16, 2006, for Ferrel's corporate card that listed $3,163.15 in personal expenses.[75]  Ferrel admitted in her deposition that the charges were for personal expenses.[76]  Air Liquide has also provided a copy of its corporate policy regarding the corporate American Express cards, which states, "no personal use authorized except in case of an emergency."[77]

---

[74]Deposition of John Andresen, Exhibit G to Air Liquide's Motion, Docket Entry No. 23, p. 177:2-13.

[75]Corporate Card Statement of Account, Exhibit A, Part 3 to Air Liquide's Motion, Docket Entry No. 23, pp. 28-31.

[76]Deposition of Jacqueline Ferrel, Exhibit A to Air Liquide's Motion, Docket Entry No. 23, pp. 171:2 - 172:8.

[77]Travel & Entertainment Policies & Procedures – Amex Cards, Exhibit N to Air Liquide's Motion, Docket Entry No. 23, § 2.1.3.

Air Liquide has presented evidence that at the time of Ferrel's termination Air Liquide had knowledge that Ferrel was using the corporate card for personal expenses.  Because this use of the card was in violation of Air Liquide policies, Ferrel's use of the card constituted a legitimate, non-discriminatory reason for terminating Ferrel.  Air Liquide has therefore met its burden regarding this explanation.

**E.    Pretext**

Once the defendant meets its burden of establishing a legitimate, nondiscriminatory reason for the adverse employment action, the burden shifts back to the plaintiff to prove that the employer's stated reason for the adverse action was merely a pretext for the real, discriminatory purpose.  <u>Gee</u>, 289 F.3d at 345.  A "plaintiff can survive summary judgment by producing evidence that creates a jury issue as to the employer's discriminatory animus or the falsity of the employer's legitimate nondiscriminatory explanation." <u>Sandstad</u>, 309 F.3d at 897.

The EEOC argues that the evidence creates fact questions as to each of Air Liquide's asserted explanations for Ferrel's termination, and that ultimately there is a fact question about whether the asserted explanations are a pretext for Air Liquide's true retaliatory motive.

1.    <u>Poor Attendance and Continued Tardiness</u>

The EEOC argues that Air Liquide's explanation concerning Ferrel's tardiness is a pretext for retaliation.  The EEOC presents

the declaration testimony of Amelia Cooper, who worked with Ferrel under Cahill.  Cooper states:

> I helped train Ms. Ferrel.  During that time, we worked together closely.  Based on my observation, Ms. Ferrel was always there on time, and did not have issues with attendance or tardiness, and she put in a full 8 or 9 hours each day.  If, on occasion, she was going to arrive at the office after her customary time, Ms. Ferrel always called in advance to advise about her arrival time.[78]

Cooper's testimony is only relevant concerning facts about which she had personal knowledge, meaning that her observations do not speak to Ferrel's punctuality in the months after she was transferred to the North Zone.  Because Air Liquide refers to "continued tardiness," however, and because Air Liquide cites statements by Dan Cahill in support of its allegations of tardiness, Cooper's testimony raises a fact question about whether Cahill's allegations of tardiness are accurate.

The EEOC further questions Air Liquide's explanation by noting that analysts are available by telephone 24-hours a day, so the specific time of arrival of the employee is perhaps less important than it would be in a job in which the employees could not work remotely.  There is also evidence in Spencer's deposition from which a juror could conclude that the time at which Ferrel was supposed to arrive at work may have been set somewhat arbitrarily. Spencer testified that Ferrel was supposed to arrive at work by 7:30 a.m. while other employees in the region could report by

---

[78]Declaration of Amelia Cooper, Exhibit 22 to EEOC's Response, Docket Entry No. 27, ¶ 3.

8 a.m.[79]  When asked why Ferrel was to report by 7:30 a.m., Spencer responded that it was because of the "Time zone of the area that she was scheduled."[80]  Ferrel's depot was in the Central Time Zone, however, while other employees scheduled deliveries in the Eastern Time Zone, where business starts an hour earlier.  Spencer could not recall if those employees who scheduled for the Eastern Time Zone were required to arrive earlier.  A juror could conclude from this testimony that Spencer perhaps held Ferrel to a different standard than he did other employees.

The EEOC has raised questions of fact about whether Ferrel's tardiness problems were as serious as Air Liquide has alleged, and whether they were of sufficient magnitude to induce Air Liquide to terminate her.  While a rational jury could conclude that Ferrel's tardiness was one of the reasons for which Air Liquide decided to terminate her, it could also conclude that this reason was a pretext articulated by Air Liquide in order to cover up its true reasons.

2.  <u>Scheduling Errors</u>

The EEOC argues that objective evidence contradicts the testimony offered by Air Liquide's managers about Ferrel's scheduling errors.  The EEOC notes that Ferrel received

---

[79]Deposition of Rob Spencer, Exhibit C to Air Liquide's Motion, Docket Entry No. 23, pp. 84:12 - 85:3.

[80]<u>Id.</u>

discretionary incentive bonuses in the first- and second-quarters of 2006, and that the vast majority of Air Liquide's documentation of scheduling errors was created after Ferrel brought her harassment claim against Cahill.  The initiation of active documentation of errors after Ferrel's complaint could thus be seen as retaliation.  The EEOC also argues that the errors documented in the period after Ferrel made her complaint against Cahill and before she was transferred to the North Zone should be viewed with suspicion because during this period Cahill made changes to her working conditions, including taking her off call and changing her schedule.[81]  Ferrel expressed her opinion to Andresen during this period that Cahill was "setting her up for failure."[82]

Regarding the performance issues noted by Spencer, the EEOC points out that Ferrel did not appear to experience any performance problems while she was supervised by McKenna,[83] and that there appear to be questions about whether she received adequate training after she was transferred to a new zone with unfamiliar customers.[84] The EEOC also notes that during the time Ferrel worked under Spencer there were no customer run-outs attributed to her.  Air

---

[81]John Andresen's notes, Exhibit 16 to EEOC's Response, Docket Entry No. 27.

[82]Id.

[83]Deposition of Donald Ray McKenna, Exhibit 19 to EEOC's Response, Docket Entry No. 27, p. 23:4-14.

[84]Deposition of Jacqueline Ferrel, Exhibit A to Air Liquide's Motion, Docket Entry No. 23, p. 167:12-17.

Liquide states in its Motion for Complete Summary Judgment that "The primary job of both the Logistics Analyst and the Depot Manager is to ensure that customers do not have a 'run-out' of the gases they need to keep their businesses operational."[85]  The EEOC presents evidence that other employees experienced run-outs in 2006,[86] but states that these other employees were not terminated.

Air Liquide has provided substantial evidence that Ferrel's managers found her performance deficient.  A jury that finds the testimony of Air Liquide's managers credible will likely find that Ferrel's deficient performance constituted a legitimate, nondiscriminatory reason for Ferrel's termination.  A jury is not required to find Air Liquide's managers credible, however.  The EEOC has raised issues that might induce a jury to look on the managers' testimony with suspicion.  A rational jury reviewing the record could conclude that Ferrel's performance was generally satisfactory to Air Liquide until Ferrel filed her harassment claim against Cahill.  The jury could find that Air Liquide's managers, in retaliation, began to document scheduling errors aggressively and to set her up for failure by changing her working conditions and transferring her to an unknown territory under a manager with a history of difficulty managing women.  A jury that believed these things might conclude that the scheduling errors described by

---

[85]Air Liquide's Motion, Docket Entry No. 23, p. 5.

[86]Account Information, Exhibits 32 to 37 to EEOC's Response, Docket Entry No. 27.

Fleming were not the true cause of Ferrel's termination, but rather the pretext that Air Liquide used to justify their decision to terminate Ferrel, which had been made months earlier in response to Ferrel's harassment claim.

3.   <u>Excessive Personal Phone Calls</u>

The EEOC argues that Air Liquide's explanation regarding Ferrel's allegedly excessive personal phone calls is pretext for Air Liquide's true reasons.  Air Liquide cites several statements from Oswald's deposition in support of its argument, but Oswald's deposition never states that he considered the phone calls to be a sufficient justification for Ferrel's termination.   When asked about the "inappropriate personal calls," Oswald responded, "I don't know that I would deem it inappropriate.  I don't know what the personal calls involved.  It could have been – and that wasn't the primary gist of the termination.  My biggest concern was the performance issues and the customer complaints."[87]  Oswald further stated that he did not physically hear Ferrel make personal phone calls, and that he was told by someone else that Ferrel made excessive calls during work hours, but he could not specify who gave him that information.[88]  Oswald's statements thus show that he lacked personal knowledge of Ferrel's excessive calls, and that he did not even necessarily consider the calls inappropriate.

_____

[87]Deposition of Clark Oswald, Exhibit B to Air Liquide's Motion, Docket Entry No. 23, p. 54:11-15.

[88]<u>Id.</u> at p. 55:4-25.

The EEOC argues that Air Liquide effectively made the decision to terminate Ferrel months before it received the phone bill that Air Liquide presents in support of its allegations.  Furthermore, the EEOC argues that Air Liquide never establishes how many of the calls were personal, or how many were made during work hours; and it never articulates a standard by which it would consider a particular call "inappropriate," or a given number of calls as "excessive."  Since Air Liquide cannot establish which calls were inappropriate, nor can it establish what standard it would use to determine whether Ferrel's calls were excessive, a rational juror could conclude that the allegation of excessive personal calls was nothing more than a make-weight argument added onto the termination letter.

### 4.   Inappropriate Use of the Corporate Credit Card

The EEOC challenges Air Liquide's explanation that it terminated Ferrel because of her inappropriate use of the corporate American Express card.  First, the EEOC argues that the decision to terminate Ferrel was effectively made in early September, months before Air Liquide had notice of Ferrel's personal charges on the card.  Second, the EEOC argues that other employees at Air Liquide use the corporate American Express cards for personal expenses and are not punished for it.  The EEOC cites the deposition testimony of Ferrel that an administrative assistant and a manager at Air Liquide told her that she could use the card for personal expenses

as long as she paid off the charges.[89]  The EEOC also cites evidence from Spencer's corporate card bills that it argues shows that Spencer used his card for personal expenses.[90]  The EEOC also argues that the billing statements show that both Spencer and Oswald were delinquent at times in paying off their credit cards in 2006.[91]

The EEOC has raised a fact question regarding whether Air Liquide chose to apply the policy against personal use of corporate cards selectively against Ferrel, while ignoring violations of the policy by other employees.  If jurors concluded that Air Liquide was applying the policy selectively, they could also conclude that Air Liquide's explanation that it fired Ferrel for violation of the policy was not true, and was in fact pretext for Air Liquide's true retaliatory motive.

### 5.   Conclusion

Because the EEOC has raised jury issues as to each of the reasons raised by Air Liquide as legitimate, nondiscriminatory reasons for Ferrel's termination, the court concludes that the EEOC has met its burden under McDonnell Douglas.  Summary Judgment is therefore not appropriate.

---

[89]Deposition of Jacqueline Ferrel, Exhibit 4 to EEOC's Response, Docket Entry No. 27, p. 173:1-25.

[90]Corporate Card Statement of Account, Robert B. Spencer, Exhibit 39 to EEOC's Response, Docket Entry No. 27, pp. 3-10.

[91]Id. at 3-11.

**F.    Mixed Motive Retaliation**

The EEOC argues in the alternative that summary judgment is improper because the evidence establishes issues of material fact under the mixed-motive theory.   Under this theory, a plaintiff establishes that an adverse employment action was discriminatory by demonstrating that discrimination was a motivating factor for the action, even though other factors may also have motivated the action.   See Rachid v. Jack in the Box, Inc., 376 F.3d 305, 312 (5th Cir. 2004).   The Fifth Circuit has applied the mixed motive alternative to a Title VII retaliation case in an unpublished decision.   See Block v. Kelly Servs., Inc., 197 Fed. Appx. 346, 348-49 (5th Cir. 2006).   Several district courts in this Circuit have also applied the mixed-motive alternative to Title VII retaliation cases.   See Smith v. Xerox Corp., 584 F.Supp.2d 905, 913 (N.D. Tex. 2008) (and cases cited therein).   The court concludes that it is proper to apply the mixed-motive theory in this action.

The EEOC has raised material questions of fact as to whether retaliation was a motivating factor for Ferrel's termination.   A jury could conclude that retaliation was a factor based on:

> (1)  The decision of Oswald and Pedersen to build a dismissal case against Ferrel within weeks of her harassment claim against Cahill;
>
> (2)  The sudden increase in documentation of Ferrel's performance issues immediately after she filed the harassment claim; and
>
> (3)  The changes in her work situation that followed closely after her harassment claim.

-43-

Because a jury could accept these facts as evidence of retaliation as a motivating factor in the termination decision, the court concludes that there are genuine disputes over material facts in this action.  Therefore, summary judgment is not appropriate.

## V.  **Conclusion and Order**

For the reasons explained above, the court concludes that the EEOC has established a prima facie claim of retaliation against Air Liquide, and that the EEOC has raised genuine questions of material fact regarding each explanation that Air Liquide has raised as legitimate, nondiscriminatory reasons for Ferrel's termination. Because a jury could conclude that Air Liquide's asserted reasons are pretext for retaliation, summary judgment is not appropriate. Accordingly, Defendants Air Liquide Industrial U.S. LP and Air Liquide USA LLC's Motion for Complete Summary Judgment (Docket Entry No. 23) is **DENIED**.

As described above in Part III, Defendants' Objections to and Motion to Strike Plaintiff's Evidence Filed in Support of Its Response to Defendants' Motion for Complete Summary Judgment (Docket Entry No. 31) is **GRANTED in part** and **DENIED in part**.

**SIGNED** at Houston, Texas, on this 3rd day of March, 2010.

SIM LAKE
UNITED STATES DISTRICT JUDGE

-44-